554 So.2d 158 (1989)
Willie E. LEWIS and Margie Taylor Lewis, Plaintiffs,
v.
Mary Ann TAYLOR and Robert O'Dell, Defendants.
No. 21017-CA.
Court of Appeal of Louisiana, Second Circuit.
December 6, 1989.
Writ Denied January 19, 1990.
*159 Joseph D. Toups, Jr., Mansfield, for plaintiffs-appellees.
Joseph William Bailey, Logansport, for defendants-appellants.
Before FRED W. JONES, Jr., NORRIS and HIGHTOWER, JJ.
HIGHTOWER, Judge.
This is an appeal by parents from a judgment awarding custody of their daughter to nonparents, the maternal aunt and uncle of the child. We reverse.
Bob O'Dell and Mary Ann Taylor, who have resided in the state of Texas since 1978, are the parents of four children born of their union and common law marriage.[1] *160 Mr. O'Dell is the father of six other children by his first wife; three of those are now majors and the other three reside with him. Also, Mary Ann Taylor (Ms. O'Dell) is the mother of one child, her oldest, Dana, born of another relationship. Thus, together the couple has parental responsibility for eight minors, including the child involved in this case, Melissa, who was born on January 7, 1983.
In October 1983, Bob and Mary separated. With her five children, she moved from Texas to the home of her mother in Shreveport. Mr. O'Dell later came to Louisiana, in September 1984, and returned to Texas with three of the five children, the three boys. Ms. O'Dell kept her two daughters, Melissa and Dana.
Earlier, in about April 1984, Ms. O'Dell realized that she had a drinking problem and entered an alcohol detoxification center for a week. At that time her sister, Margie Lewis, came to the hospital and asked to take Melissa to the Lewis residence in Stonewall, Louisiana, about ten miles from Shreveport. Although Ms. O'Dell left the hospital a few days later, the child continued to have extended stays with Margie and her husband, Willie. Within a short time, Melissa was basically residing with the Lewises, who also had Margie's two children by a prior marriage, ages 15 and 11.
Bob O'Dell maintained health insurance on Melissa and, in March 1985, when the Lewises stated she needed medical care, he sent a letter reflecting the insurance plan number and the "(f)ather's telephone number" both at home and at work. The letter also authorized the Lewises to act as temporary guardians.
About three months later, in July 1985, Mr. O'Dell took Melissa to his home in Texas for more than three weeks. Upon the occasion of her return, the Lewises gave a homecoming party. Mr. O'Dell, after bringing her back, spent the night in the Lewis home. According to Margie Lewis, at that time he also provided her with a wallet size copy of the child's birth certificate.
In January 1986, Ms. O'Dell complained to Bob that the Lewises would not allow her to take the child from their home. A few days later, Mr. O'Dell transported Melissa to his home, where she remained for approximately three months. In April, Ms. O'Dell traveled to Texas to visit her children and discuss reconciliation with their father. Planning to work for a week in Shreveport, she returned to Louisiana on April 21, 1986 and brought Melissa to the home of the Lewises to visit for the week. When she attempted to retrieve the child after work that following Friday, she was unable to locate the Lewises, who had called earlier in the day to ask how late she worked. On Monday, she learned of the Lewises' suit for custody. Subsequently, she and Mr. O'Dell reconciled in November 1986.
Although an ex parte order granted plaintiffs provisional custody, over 16 months elapsed before the case was tried. An opinion in favor of the Lewises was filed four months after trial, but a judgment was not signed for over a year.
Defendants appeal, asserting that the trial court erred in awarding custody of their daughter to the Lewises. Appellants also contend that the minor child was denied due process of law by not being represented by her own attorney as required by C.J.P. Art. 95.

DISCUSSION

A.
In child custody cases, the trial judge is vested with a vast amount of discretion and his determination of custody will not be overturned in the absence of a clear showing of abuse. Lions v. Lions, 488 So.2d 445 (La.App. 3rd Cir.1986).
In Hughes v. McKenzie, 539 So.2d 965 (La.App. 2d Cir.1989), writ denied, 542 So.2d 1388 (La.1989), a divided panel of this court considered the standards of C.C. Art. 146(B) in a parent-nonparent permanent custody controversy. Divergent views respecting application of that statute, which *161 expands more favorably toward nonparents the earlier jurisprudential rules, are set forth in the opinion. However, at the present juncture further discussion concerning the advisability vel non of applying Article 146(B) to such situations is pretermitted, since under even the standards of that provision the Lewises have failed to prove that they are entitled to custody.
In a contest between parents and nonparents, the parents enjoy a paramount right to custody of their child, and may be deprived of such right only for compelling reasons. Burt v. McKee, 384 So.2d 489 (La.App. 2d Cir.1980); Gordy v. Langner, 502 So.2d 583 (La.App. 3rd Cir.1987), writ denied, 503 So.2d 494 (La.1987). These compelling reasons must be expressly determined and supported by convincing proof. Wood v. Beard, 290 So.2d 675 (La. 1974); State in Interest of Jones v. Jones, 430 So.2d 169 (La.App. 2d Cir.1983).
The burden of proving that the parent's custody would be detrimental lies with the nonparent. Gras v. Gras, 489 So.2d 1283 (La.App. 2d Cir.1986), writ denied, 493 So.2d 1222 (La.1986); Boyett v. Boyett, 448 So.2d 819 (La.App. 2d Cir. 1984). A parent's paramount or superior right of custody can only be outweighed when sufficiently grave detriment, occurring to the child's best interests through custody by the parent, requires an award to a nonparent. Boykin v. Corless, 488 So.2d 1153 (La.App. 2d Cir.1986), Boyett v. Boyett, supra. The best interests of the child must be cautiously weighed against the rights of the biological parent, which it is also necessary for the court to consider. While it certainly could be in the interest of many children to be reared in homes other than that of their parents, that test standing alone cannot be used to deprive the parents of custody of their child. In re Custody of Reed, 497 So.2d 1084 (La.App. 4th Cir.1986).
Art. 146(B) sets forth a dual-pronged requirement which must be met before a parent may be denied his or her child and custody placed with a nonparent; it must be shown that an award of custody to the parent would be detrimental to the child and that the award to a nonparent is required to serve the best interests of the child. Lions v. Lions, supra; Boyett v. Boyett, supra.
In the present case, the court concluded that Melissa's parents intended to abandon the child to the care of the Lewises and to have them care for her as if she were their own. The "temporary custody" letter, signed before a notary, and the pocket-sized copy of the child's birth certificate given to the Lewises by Mr. O'Dell, strongly influenced the court, as did also the factors of the child's reference to the Lewises as "daddy" and "mama" and the payment of all her medical bills by them. Finally, the sporadic communication and contact with Melissa by her parents, in addition to their having provided no support after she began residing with the Lewises, played a role in the decision below. The opinion of the trial court went on to state:
Bob O'Dell and Mary Taylor are not bad people, but they did abandon this child to the care of the Lewis' for at least two and one-half (2½) years. (October 1983-April 1986) The child has resided with the Lewis' (sic) continually since October of 1983 until the present. Now that defendant's (sic) have reconciled, they feel they should have the child back, as legal and natural custodians.
Contrary to the trial court's conclusions, however, the record fails to clearly show an intent by Melissa's parents to permanently relinquish custody. Indeed, plaintiffs could not unequivocally state that Ms. O'Dell intended to permanently give up the child. Mr. Lewis said neither parent ever told him they intended to surrender such custody. Although the child eventually remained basically with the Lewises, the evidence indicates that at least initially she was taken care of by her grandmother as well. Under the circumstances, it apparently was necessary that someone care for Melissa, the youngest of the O'Dell children, for some period of time. Mr. O'Dell testified that he felt, based upon his responsibility for seven other children, that he was not *162 equipped to care for a child of young age at that time. Quite obviously, Ms. O'Dell faced a crisis situation and was unable to provide for the child.
Neither does the fact that the Lewises received certain documents concerning Melissa demonstrate an intent by her parents to leave her with plaintiffs permanently. Mr. O'Dell denied giving the Lewises the small copy of the birth certificate, and said the letter simply permitted them to act as temporary guardians for the child. Indeed, the document expressly does give the Lewises authorization to act as "temporary guardians" and provides nothing further. The other document, even assuming that Mr. O'Dell gave it to the Lewises, is merely a birth certificate card and not the child's actual birth certificate. In that the child was in the temporary guardianship of her aunt and uncle, it does not seem inconsistent to provide them with a birth certificate, or a similar document, for any variety of purposes and reasons.
Likewise, the child's reference to the Lewises by the names previously indicated is not greatly significant. It is certainly not inconceivable that plaintiffs were instrumental in teaching Melissa, at her very young age, to associate them with these designations.
The lower court noted that the Lewises paid all of the child's medical bills, and that her parents provided no support for her. All the same, the evidence indicates that Mr. O'Dell made 19 support payments, albeit to Ms. O'Dell's mother. Some of those payments occurred while Melissa partially lived at the Shreveport residence and were in contemplation of her benefit along with that of the other children. Mr. O'Dell's payments continued until even late 1985, and he stated that such assistance would have been provided to the Lewises had they asked. The previously mentioned letter reflects an obvious intent by Melissa's father that his health insurance be utilized for her treatment, yet the record leaves unclear why that did not transpire. However, even if it is assumed that Mr. O'Dell did not provide support for Melissa, that is insufficient to deprive him of custody of his own child. See Lions v. Lions, supra, where custody was awarded to a natural father although he failed to support his child for at least three years.
Furthermore, the evidence of contact or attempted contact between Melissa's parents and the child is most unconvincing of an intent to permanently place her with the Lewises. Indeed, Mr. Lewis admitted that prior to the custody suit the parents continued such contact. For the most part Ms. O'Dell was without transportation; nonetheless, at one point in time she called about twice a month at least. Evidence indicated that Mr. O'Dell placed numerous phone calls to the Lewis home from 1984 to 1986. In July of 1985, Mr. O'Dell took Melissa from the Lewis home to stay with him for 23 days. Additionally, in October and December 1985, at his request, Melissa and her mother were transported to Texas to visit with the rest of the family.
Most importantly, of course, Mr. O'Dell returned Melissa to his home in late January 1986, and she resided there for three months and until about a week before the custody proceedings were filed. Ms. O'Dell had become upset when the Lewises made excuses for not allowing her to see Melissa for the child's birthday, January 7, 1986. She then called Mr. O'Dell to complain and shortly thereafter he removed Melissa from the Lewis home. Irrespective of any earlier intention, Mr. O'Dell had permanently returned his child to his home in January 1986.
Viewing the evidence in its entirety, it is plain that the parents' contact with Melissa, although sporadic at times and also neglectful of cards and gifts, continued until the custody suit was filed. After then, of course, contact by the parents with Melissa was quite limited. Mr. O'Dell testified that he was warned by Texas counsel not to communicate via telephone. Ms. O'Dell stated that a sheriff's deputy, who accompanied her to the Lewis residence after the suit, told her not to attempt further contact, all indicating that the Lewises may have been less than cordial on that occasion.
*163 The trial judge finally made oblique reference to the psychological trauma that Melissa might sustain upon being "`simply uprooted'" from the Lewis home. In that connection, the lower court was clearly wrong in finding that Melissa had resided with the Lewises since October 1983. All parties agree that Melissa did not begin to permanently reside with the Lewises until mid-1984. Nor had she thereafter continued to live with plaintiffs. Instead, she had been removed from that home for some three months before suit was filed. Noting a strong bond between Melissa and the Lewises, the reporting psychologist opined that in her best interest she ought to continue having contact with them, but he did not conclude that under no circumstances should custody be returned to her parents. In fact, he suggested a modified plan by which Melissa would gradually adjust to being with her parents if custody were granted to them.

B.
In these proceedings, the burden was on the nonparents to show by clear and convincing evidence that the granting of custody to the parents would be gravely detrimental to the child. Boyett v. Boyett, supra, and authorities previously cited. The Lewises have failed to discharge that obligation. The court below erred in so finding and in determining that Melissa's best interests required that her parents be denied custody. With even stronger reason, the evidence in no manner approaches proof of "abandonment" as defined in LSA-R.S. 9:403, although it is unlikely the lower court employed that term in such a sense.
Although the effect of returning the child to the parents may create a degree of short term emotional stress, the evidence does not establish such a severe or grave detriment as would require that custody be awarded to the nonparents. It is also appropriate to mention that much of the psychological disservice arises from the long period of judicial delays occasioned because, rather than permit the child's return to her true parents, the nonparents have chosen to pursue an extended quest for custody. Otherwise, the emotional effects would have been substantially diminished. As matters now stand, some period of progressive adjustment will be desirable.
The psychologist did not question the parental capabilities of any of the four parties involved. Both homes were found to be satisfactory by the social workers. Both couples have been separated at different times, but there is no present indication of any problems in either family. Although at one point physically unable to care for Melissa, Ms. O'Dell has reconciled with her husband and apparently recovered from her drinking complications. Thus, home studies and psychological evaluations indicate that both the O'Dell and Lewis homes are suitable for the child's rearing. The two annual incomes are broadly comparable but, of course, more children must be provided for in the O'Dell residence.
When the homes of both parties in a custody suit are acceptable, it is not appropriate to award custody simply upon the basis of who can provide greater material advantages to the child. Compare Bailey v. Bailey, 527 So.2d 1030 (La.App. 2d Cir.1988), writ denied, 528 So.2d 565 (La.1988); Peters v. Peters, 449 So.2d 1372 (La.App. 2d Cir.1984), where this rule is enunciated in contests between parents. Such rationale obviously should apply in a parent-nonparent contest, where a stronger case can be made that material advantages are not proper considerations for determining custody.

C.
It is probably also advisable to again mention the recent case of Hughes v. McKenzie, supra. There, about three days after her birth, the child began living with her mother's first cousin. Four years elapsed before the parents first attempted to have her returned to their home. The mother's husband, who was not the biological father, previously had initiated an illicit relationship with a young girl under his care. By contrast, in our present case, Melissa lived with the nonparents less than two years before the proceedings began. Furthermore, immediately prior to the suit, her father had returned her to his home *164 where she lived for three months. The O'Dell home appears more stable than that of the parents in Hughes, and there is more evidence of continued contact between Melissa and her parents. Of course, in instances such as these, each case is different and must be decided on its own peculiar facts. Tabor v. Tabor, 421 So.2d 1185 (La.App. 2d Cir.1982).
Having resolved the initial issue favorably to appellants, it seems unnecessary to address their additional contention that counsel should have been appointed for the minor in accord with C.J.P. Art. 95. In any event, however, the Code of Juvenile Procedure is inapplicable since this is a civil matter, not a juvenile court proceeding. C.J.P. Art. 24.

CONCLUSION
For the reasons indicated, the trial court judgment is reversed at appellee's cost, here and below. There is now judgment in favor of defendants and against plaintiffs, ordering that the child, Melissa Dawn O'Dell, be returned to the custody and control of defendants after a gradual adjustment period of no more than six months. To that end, the case is remanded to the trial court with instructions to devise and execute an appropriate plan providing for expanding visitations which culminate in full custody by the parents and continued visitations by the nonparents.
REVERSED AND REMANDED.
NOTES
[1] Although common law marriages are precluded under the laws of Louisiana, the courts of our state have traditionally recognized their validity when contracted in other states whose laws sanction such unions. Brinson v. Brinson, 233 La. 417, 96 So.2d 653 (1957); Tex.Code Ann. Family, § 1.91 (Vernon).