609 So.2d 1049 (1992)
STATE of Louisiana in the Interest of C.G.
No. 24,631-JA.
Court of Appeal of Louisiana, Second Circuit.
December 2, 1992.
Writ Denied February 5, 1993.
*1050 Jefferson, Edwards & Tocke by Stephen A. Jefferson, Monroe, for appellant.
Blackwell, Chambliss, Hobbs & Henry by James A. Hobbs, West Monroe, for appellee.
Before MARVIN, SEXTON and LINDSAY, JJ.
LINDSAY, Judge.
J.P. and S.P. are the biological parents of C.G., a minor child. They appeal from a trial court judgment denying their rule to obtain custody of their daughter, C.G., from the maternal grandparents, in whose home the child had been placed by the Department of Social Services (DSS) after her removal from her mother's care. For the reasons assigned below, we affirm.

FACTS
C.G., the child who is the subject of these proceedings, was born on May 26, 1986, to J.P., a 17-year-old unmarried woman. (S.P., who was 40 years old when the baby was born, initially denied paternity. However, he eventually signed an acknowledgment of paternity and married the mother in 1989.)
In December, 1986, the DSS began to receive reports that C.G. had severe diaper rash because of her mother's neglect. It was also reported that the mother would frequently leave the infant alone in their apartment. These complaints were validated. In January, 1987, a social worker was assigned to the case, but she was only able to arrange one meeting with the mother.
In April, 1987, the DSS was still receiving complaints that, in addition to leaving the baby alone in the apartment, the mother was also leaving her alone in a car, sometimes for hours at a time. Furthermore, when the mother did leave the baby *1051 with other people, she would be gone for more than 24 hours without providing them with any means by which they could contact her in case of emergency.
On May 21, 1987, a petition was filed by the DSS in the Monroe City Court, sitting as a juvenile court (hereinafter referred to as "the juvenile court"), seeking custody of the child. Pursuant to this petition, an instanter order was issued which granted the temporary custody of the child to the DSS. At a hearing the next day, custody in the DSS was continued. The juvenile court also ordered the mother to attend parenting skill classes and be evaluated by a psychologist.
Mr. G., the child's 40-year-old maternal grandfather, and Mrs. G., his 36-year-old wife, contacted the DSS, expressing an interest in taking the baby into their home.[1] A home study of their family concluded that they could provide a suitable home for the child.
In June, 1987, Dr. Bobby Stephenson conducted a psychological evaluation of the mother. He found her to be emotionally immature and manipulative. He further found that she tended to "gloss over any problems" and insisted that leaving the baby alone did not constitute neglect. Dr. Stephenson also noted severe problems in her relationship with her father.
On June 12, 1987, the DSS filed a petition in the juvenile court seeking adjudication of C.G. as a child in need of care. Pursuant to this petition, the juvenile court subsequently declared her to be a child in need of care. In July, 1987, the juvenile court continued custody of the child with the DSS but placed her in the grandparents' home. On September 29, 1987, a hearing was held at which the court directed that the child remain in the custody of the state and that physical placement remain with the grandparents. The court again ordered the mother to attend parenting skill classes and receive counseling.
In March, 1988, the DSS recommended that legal custody of C.G. be granted to the grandparents. On March 29, 1988, the juvenile court concurred in this recommendation and placed her in the custody of the grandparents.
In August, 1989, the mother filed a motion in the Fourth Judicial District Court, seeking to obtain custody and/or visitation, claiming that she had not been allowed to see the child since January, 1989. She had finally completed a parenting skill class and had also obtained an acknowledgment of paternity from the child's father. At this time, the district court established a visitation plan for every other weekend.
In October of 1989, the parents were married. In November, 1989, the district court ordered that the previously set visitation schedule be continued, and that a home study be conducted on the parents. The home study, which was submitted to the district court in February, 1990, was favorable.
In July, 1990, additional evaluations were performed pursuant to a motion filed by the grandfather. The resulting report was particularly complimentary of the father and the grandparents. Dr. David Boyle, the counselor who performed the evaluations, found that all of the parties were interested in doing what was best for the child. However, Dr. Boyle recommended that C.G. remain in her grandparents' custody and that the current visitation with the parents (every other weekend) be continued. The recommendation was based on the fact that the child was doing "exceptionally well" under her present living arrangements. Dr. Boyle acknowledged that visitation with the parents might be increased at a later date.
In July, 1990, the district court sustained the grandparents' exception to jurisdiction and transferred the matter to the juvenile court. The district court found that the juvenile court had exclusive jurisdiction because of its prior adjudication proceedings. Thereafter, the mother filed a motion in the juvenile court seeking modification of the *1052 adjudication order, which had placed the child in the custody of the grandparents. In her motion, the mother requested that C.G. be returned to her custody.
On August 21, 1990, a hearing was held in the juvenile court on the mother's motion for modification of custody. (Shortly thereafter, the mother gave birth to her second daughter.) On November 19, 1990, the court rendered a written opinion in which it ordered that C.G. remain in her present environment. It found that the child had bonded with the grandparents and was thriving in their care. The court specifically found that the mother was still as manipulative as when she was originally evaluated by Dr. Stephenson in 1987. The court expressed grave concerns about the stability of the parents' marriage, as well as the conflict between the grandfather and the mother. Although the father had acknowledged paternity, the court noted how vehemently he had previously denied paternity.
The juvenile court concluded that it would be a "total disservice" to C.G. to return her to her mother's care. Among the many factors contributing to this conclusion were the mother's poor record in child care, the recent birth of the parents' second child, and the resulting stress that placed upon the mother. However, the court specifically stated that if the mother ever showed a consistent pattern of stability, it might reevaluate the case sometime in the future. The current visitation schedule was continued. Judgment was signed on April 29, 1991.
On April 1, 1992, the parents filed the present rule to modify custody. On April 21, 1992, the grandparents obtained an order directing the father to pay child support of $465 per month, effective January 1, 1992. On May 22, 1992, a hearing was held on the parents' rule to modify custody.
At the hearing, the parents presented the testimony of several witnesses who praised their care of their second child, who was then almost two years old. However, this testimony also established that when the parents had C.G. for visitation every other weekend, they would often leave her with a babysitter or let her stay overnight at other children's homes on Saturday night.
The grandparents sought to show that the recent child support order was the underlying basis for the parents' present rule to change custody. Although the father initially admitted this during cross-examination, he immediately recanted the statement, insisting that the issue of child support had nothing to do with his efforts to seek custody. Nonetheless, the father indicated that he didn't feel he should have to pay for C.G.'s support if he couldn't have the child in his physical custody. He also stated that if the grandparents wanted the girl so much, they "can afford" her. Although he claimed to be willing to contribute to C.G.'s upkeep, he stated that he would not willingly hand over money to the grandparents.[2]
The testimony demonstrated that the grandparents, who are Mormons, have formed a harmonious family with the children of their various marriages. The grandfather has a 18-year-old daughter from his marriage to J.P.'s late mother, and the grandmother has a 17-year-old daughter and a 13-year-old son from her previous marriage. Together they have two daughters, ages nine and six.
During the five years that C.G. has lived with them, the grandparents have raised her with their own children. They have also attended to her substantial medical needs with virtually no financial assistance from the parents. Their family lives in a four-bedroom house where C.G. shares a bedroom with the two youngest daughters. However, the grandfather testified that the two eldest daughters were scheduled to go off to college in the fall of 1992, thereby freeing up a bedroom.
*1053 The grandparents presented the testimony of Dr. David Boyle as an expert in marriage and family counseling. (Dr. Boyle previously evaluated the parties for the court in 1990.) He testified that C.G. was at a particularly vulnerable state in her young life and that he did not recommend changing her environment at that time. He characterized such change as being "on the risky side."
Dr. Boyle testified that C.G. needed consistency at her age. He also indicated that the changes resulting from an award of custody to the parents (changes in family, home, school, and friends) could have a negative effect on the child. However, Dr. Boyle stated that if the situation remained satisfactory, he would not be opposed to the child's increased visitation with the parents.
Dr. David René Dugas, an ear, nose and throat surgeon, testified about C.G.'s ear problems, which had become an issue between the parents and the grandparents. Dr. Dugas began treating the child for persistent eustachian tube dysfunction in 1990. In addition to ear infections, she also suffered from enlarged tonsils. (Apparently, these medical problems are hereditary.) Eventually, Dr. Dugas surgically placed vent tubes in her ear drums. These tubes can be contaminated by water, causing serious infection.
The grandparents testified that C.G.'s ear problems were frequently worse after her visits with her parents because they failed to use the ear plugs provided to them. However, the parents insisted that the ear plugs were too big and painful for the child. Consequently, the parents chose to put cotton in her ears whenever she was exposed to water.
Dr. Dugas testified that the ear plugs are available in various sizes, ranging from infants to adults, and that there are rarely problems with them staying in place. He stated that cotton was not effective because it would act as a wick and allow water in the ear. However, cotton could be used if it were rolled in petroleum jelly. (On rebuttal, the father insisted that when he put cotton in the girl's ears, he used an oil which he felt was just as effective as petroleum jelly.)
At the conclusion of the hearing, the court held that it had not observed any consistency in the parents' judgment and actions concerning C.G. It found that it was "incomprehensible" that the parents had not used the ear plugs supplied to them. The court further found no compelling reason to take the girl from a stable and nurturing environment, and that her best interest demanded that she be left in her present setting. On June 15, 1992, the juvenile court signed a judgment denying the parents' rule for change of custody.
The parents appeal.

LAW
In a contest between parents and nonparents, the parents enjoy a paramount right to custody of their child, and may be deprived of such right only for compelling reasons. Lewis v. Taylor, 554 So.2d 158 (La.App.2d Cir.1989), writ denied, 554 So.2d 1237 (La.1990).
At an initial custody contest between a parent and nonparent, the burden of proof is on the nonparent to show that granting custody to the parent would be detrimental to the child and that the best interest of the child requires an award of custody to the nonparent. Bolding v. Bolding, 532 So.2d 1199 (La.App.2d Cir. 1988).
However, following an initial considered decree, the parents' paramount right to custody must be considered in conjunction with the principles expressed in Bergeron v. Bergeron, 492 So.2d 1193 (La. 1986), and the concerns for terminating repeated litigation and continuing a child's established living environment. Bergeron applies to all attempts to modify custody following an earlier considered decree, including a dispute between a parent and a nonparent. Sheppard v. Hood, 605 So.2d 708 (La.App.2d Cir.1992).
A considered decree is one for which evidence as to parental fitness to exercise custody is received by the court. *1054 Norris v. Norris, 604 So.2d 107 (La.App.2d Cir.1992).
Thus, a parent seeking custody of a child awarded to a nonparent by an earlier considered decree bears the heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by the advantages a change affords the child. Sheppard, supra.
In the Sheppard case, this court specifically declined to follow a line of Third Circuit cases holding that a parent is automatically entitled to a change in custody solely upon a showing of the parent's rehabilitation. See State in Interest of Sylvester, 525 So.2d 604 (La.App. 3d Cir.1988), and Gordy v. Langner, 502 So.2d 583 (La. App. 3d Cir.1987), writ denied, 503 So.2d 494 (La.1987).
The trial court's findings of fact in child custody matters are entitled to great weight, and its discretion will not be disturbed on review in the absence of a clear showing of abuse. Norris, supra.

DISCUSSION
The parents contend that they are entitled to custody of their biological child unless the nonparents can show that the parents' custody would be detrimental to the child and that the child would suffer substantial harm if placed in the parents' custody. To the contrary, the grandparents contend that the evidence clearly showed that it is in C.G.'s best interest to remain in their custody.
In order to resolve this custody dispute, we must examine the previous custody decrees. We find that the custody decision rendered in November, 1990, after the August, 1990 hearing, was a considered decree. Evidence was adduced at that hearing concerning the fitness of the parents to have custody of the child. Consequently, in order to obtain modification of C.G.'s custody at this time, the parents must meet the Bergeron standard. Sheppard, supra.
An examination of the record reveals that the parents have failed to show any detriment to the child in her present environment. Nor have they shown that the harm to C.G. from uprooting her from her present environment would be outweighed by any advantages resulting from the change.
We agree with the trial court that it is clearly in C.G.'s best interest that she remain with her grandparents. C.G., who is now six and a half years old, has lived in the grandparents' home the major portion of her life, having been placed in their custody when she was approximately 14 months old. She has been lovingly accepted as a member of their immediate family and raised without distinction from their other children.
The record demonstrates that the grandparents' care of C.G. has been exemplary. They have devoted much time and attention to her well-being, including her considerable medical needs. She has bonded not only with the grandparents but also with their children, with whom she has established strong sibling relationships. In fact, the grandfather described C.G. and his six-year-old daughter as being "[a]lmost like twins." By all accounts, the child has done exceptionally well in the care of her grandparents.
Although the parents, especially the mother, have made impressive strides in rehabilitation, this is only one factor to be considered, albeit a significant one. Stability of the child's environment is another factor. Sheppard, supra. Our paramount concern must be the best interest of C.G. To uproot her from the only real family she has consistently known throughout her young life is not in her best interest. This is particularly true in view of the fractured relationship between the mother and the grandparents. (Although the relationship between the parents and grandparents is extremely tense, we recognize the love and affection they all have for the child.) Dr. Boyle, who evaluated C.G. in 1990 and *1055 1992, recommended against changing her environment at this time.
Furthermore, the testimony demonstrated that C.G.'s ear ailments require great care and vigilance on the part of the child's caretakers. Unfortunately, the record cast serious doubt upon the parents' diligence in dealing with this medical condition.
Based on the foregoing, we find that the best interest of C.G. mandates that she remain in her present environment. The current custody arrangement allows the child to remain in a beneficial and loving environment in which she has consistently thrived, while also maintaining and nurturing the important bond between the child and her biological parents. Additionally, the child's visitation with the biological parents may be liberally increased as deemed appropriate by the trial court.
The appellants' assignment of error is without merit.

CONCLUSION
For the reasons assigned above, the judgment of the trial court is affirmed. Costs are assessed against the appellants/parents.
AFFIRMED.
NOTES
[1] J.P.'s late mother was Mr. G.'s first wife. Thus, Mrs. G. is technically C.G.'s stepgrandmother. However, for brevity's sake, we have referred to Mr. and Mrs. G. as "the grandparents."
[2] On redirect, the father testified that he had not paid in compliance with the child support order on advice of counsel because they were seeking a rehearing on the matter. He further stated that he would pay if the court ordered him to do so. However, we also note that the grandfather testified that since 1990 the father had contributed a total of only $370 for the child's expenses.