Judgment rendered May 21, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,330-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

GWENDOLYN DIAMOND                    Plaintiff-Appellant

versus

DECARRIOUS BYRCIOUS                   Defendant-Appellee
JENKINS

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Lincoln, Louisiana
Trial Court No. 61,300

Honorable Bruce Edward Hampton, Judge

* * * * *

LAW OFFICE OF SMITH,                  Counsel for Appellant
NWOKORIE & SMITH
By: Brian Smith

DECARRIOUS BYRCIOUS JENKINS           In Proper Person

* * * * *

Before PITMAN, STONE, and STEPHENS, JJ.

**STONE, J.**

This child custody matter arises from the Third Judicial District Court, the Honorable Bruce E. Hampton, presiding. The plaintiff-appellant is the child's maternal grandmother, Gwendolyn Diamond ("the grandmother"). The child's biological mother, Tiffany Drayton ("the mother"), is deceased. The defendant-appellee is the child's biological father, Decarrious Jenkins ("the father"), who has maintained "primary custody" of the child since May 20, 2022. The grandmother initiated the instant proceedings by filing a petition for sole custody and an amended emergency ex parte petition for temporary sole custody of the child, which would grant the father only supervised visitation. The trial court denied the grandmother's proposed modification. We affirm.

### FACTS AND PROCEDURAL HISTORY

The mother and the father never married but lived together for a time. Their child, born May 14, 2013, lived primarily with the mother until her death on October 14, 2020. According to the grandmother, the father had "little contact with the child and did not have a consistent relationship with the child."

After the mother died, the child began living with the grandmother; the grandmother filed an ex parte petition for temporary and permanent sole custody on October 29, 2020. The trial court issued an order granting temporary sole custody to the grandmother and allowing the father supervised visitation.

After some litigation, the parties entered a consent judgment for permanent custody which decreed, "after the child gets out of school in May of 2022, the custody/visitation will transfer to the father having primary

custody of the minor child, D.D.[1] (the 'child') with custody/visitation to the grandmother, Gwendolyn Diamond." This judgment, which was signed May 20, 2022, gives the grandmother "custody/visitation" every other weekend during the school year and the first two weeks of June, July, and August, and provides rules specifying physical custody for holidays.

On August 29, 2022, the grandmother filed another petition for sole custody and for contempt. She alleged that the father did not allow her the "custody/visitation" provided in the consent decree and asked that he be punished with an order that he pay "penalties [,] [court costs,] and attorney's fees and…spend time in jail." The court received testimony from the child in a *Watermeier* hearing.[2] She indicated that she wanted to live with her father. The court noted this on record during the trial on the instant matter (i.e., the grandmother's most recent petition for sole custody).

The court held a contradictory hearing on the grandmother's August 29, 2022, petition; and on December 19, 2022, the court signed a judgment which: (1) ordered that, when the grandmother is to take physical custody of the child at 3 PM on a Friday during the school year, she is to do so at Ruston Elementary School; (2) ordered that all other exchanges take place at the Ruston Police department parking lot; (3) granted voluntary dismissal of the grandmother's August 29, 2022 petition for sole custody; and (4) held the father in contempt and ordered him to pay attorney fees and court costs.

---

[1] We are using the child's initials in lieu of her name.

[2] The child, if found competent to testify, may be interviewed in chambers on the record with both counsel present; the parents' presence is not required. *Watermeier v. Watermeier*, 462 So. 2d 1272, 1273 (La. App. 5 Cir.), *writ denied*, 464 So. 2d 301 (La. 1985).

On May 22, 2024, the grandmother filed yet another petition for sole custody. On June 5, 2024, she filed an amended ex parte petition for temporary emergency custody. The court held a contradictory hearing on June 24, 2024. The following paragraphs summarize the evidence adduced at that hearing.

Since the consent judgment, the child has been living at the father's residence during his periods of physical custody. The father currently shares a home in Downsville, Louisiana, with his girlfriend, Shakira. Three other children also live there: a half-sister of the child and two unrelated children of Shakira's. The father works in Midland, Texas, which, according to him, is approximately an eight-hour drive from his Downsville residence. He is a truck driver for an oilfield company and is generally expected to work for at least seven days at a time. However, he is not *required* to stay a full seven days every time he goes to Midland for work. The father in effect admitted to being gone for work during a significant amount of his physical custodial time but maintained that he is generally home for over half of each month. He also stated that the longest time he stayed gone for work was 21 days and that this was an exception to allow him to earn extra money for Christmas expenses.

On May 12, 2024, the grandmother had the child for Mother's Day. In view of the child's impending birthday on May 14, the grandmother promised the child a birthday gift upon her next visit. The next visit was per the existing decree to begin on June 1, 2024. However, the previous night, the father admittedly told the child that she "may" not be going to the grandmother's the next day; he explained to the court that he said this because the grandmother is disrespectful to him and has cost him a lot of

3

money in litigation expenses. Nonetheless, the father testified that he was out of town for work on June 1, 2024. Shakira brought the child to the police station for the exchange at 8:30 AM. However, according to the father, the grandmother was not there and did not communicate regarding her absence. Shakira then dropped the child at Sharity's house (i.e., the child's paternal aunt who assists with the child's care).

The grandmother testified that, while at her aunt's house that morning, the child texted her that: (1) the father said the child and the grandmother would never see each other again; and (2) she (the child) could not live without the grandmother and would rather die. (The grandmother did not introduce any of these alleged text messages into evidence.) The grandmother reported this to the police. In response, Ruston police conducted a wellness check and transported the child to a hospital emergency room and then later to "Brentwood," where the child remained for approximately one week. The father testified that he was on "Facetime" with his sister Sharity during the wellness check and that the police notified him they were taking the child for medical attention. He also testified that, upon learning this, he immediately left Midland and drove to the medical facility to which the child was admitted. Finally, he stated that the Brentwood records show that the child invented the suicidal ideations as a means of obtaining the coveted birthday gift from the grandmother sooner. The Brentwood records were filed into the record along with the La. C.C.P. art. 3945 affidavit but not introduced into evidence. (Moreover, no exhibits were introduced at all.)

The grandmother also alleged in her trial testimony that the child reported to her that: (1) she wanted to live with the grandmother; (2) she

4

sometimes did not have enough food while in the father's custody; (3) Shakira treated her differently than the other children in the father's household; and (4) she was not allowed to speak with the grandmother via phone while in the father's custody. Additionally, the grandmother alleged that (5) at the end of every visit with the grandmother, the child cried that she did not want to go back to the father's house; (6) the father only sees the child two or three times per month because he is gone so much; and (7) sometimes the father withheld the child during the grandmother's visitation.

On July 11, 2024, the trial court signed a judgment denying the grandmother's instant petition. The trial court's oral reasons for judgment indicate that it found that the grandmother failed to show a material change in circumstances and that the best interest of the child factors weigh in favor of the father. The grandmother now appeals. The father did not file a brief in this court.

**ARGUMENT**

The grandmother alleges in her brief to this court that since the May 20, 2022 consent judgment, the father has: (1) refused to allow her to exercise her visitation rights; (2) has denied her the opportunity to communicate with the child; and (3) spends an inordinate amount of time out of town for work, leaving the child in the physical custody of an "unrelated person" (i.e., the father's girlfriend, Shakira) while he is away; and (4) has enrolled the child in a school in Lincoln Parish despite living in Union Parish, which necessitates the child awaking at 4 AM to get to school timely on days that Shakira has work.[3] In effect, the grandmother urges that

_____

[3] In her brief to this court, the grandmother *alleges* with particularity the father's litany of supposed arrests, charges, convictions, and probation revocations; the most

5

the evidence proves these allegations and that the trial court abused its discretion in denying her instant petition for sole custody with the father being granted only supervised visitation.

As stated earlier, the father has not filed a brief in this court.

**LAW**

***Custody and visitation.*** Custody of a child has two separate components: physical custody and legal custody. A custody decree usually must determine both aspects. All legal custody is either sole or joint.[4] The Louisiana Supreme Court explained the relationship between physical and legal custody as follows:

> The typical joint custody plan will allocate time periods for *physical custody* between parents so as to promote a sharing of the care and custody of the child in such a way as to ensure the child of frequent and continuing contact with both parents. *Legal custody,* by contrast…[is]…defined as the right or authority of a parent or parents, to make decisions concerning the child's upbringing. [Formerly, in a joint custody regime,] both parents remain*ed* [sic] legal custodians of the child regardless of which parent had physical custody of the child at a given time under the typical joint custody plan. Joint *legal custody* thus involved…*sharing*…[in the]…decisions about education, medical care, discipline and other matters relating to the upbringing of the child. (Emphasis in original).

---

recent of these occurred in 2013, i.e., more than ten years before the trial on the instant matter. Most of these items were drug-related; however, the grandmother also alleges that the father pled guilty to battery of a police officer and resisting an officer by flight and misdemeanor-grade insurance fraud. The most recent *alleged* incident was a simple battery of the mother while pregnant with the child. The grandmother does not specify the date of this alleged offense but does state that the father was arraigned on July 10, 2013; she did not allege any further proceedings in that matter.

[4] When one parent or party to a joint custody decree is designated domiciliary parent, the other parent or party does not have "visitation" but instead, nondomiciliary custody. *Cedotal, infra.* "Split custody" means joint custody of siblings where the allocation of domiciliary status is not the same as to all siblings. *Sanders v. Sanders*, 05-0803 (La. App. 1 Cir. 9/23/05), 923 So. 2d 721, 723. "Shared custody" is joint custody wherein each parent has physical custody of the child for an approximately equal amount of time. La. R.S. 9:3l5.9(A)(1); *Broussard v. Rogers*, 10-593 (La. App. 5 Cir. 1/11/11), 54 So. 3d 826, 831.

6

*Evans v. Lungrin*, 97-0541 (La. 2/6/98), 708 So. 2d 731, 737-38.

[H]owever, the legislature has changed the decision-making rules in joint custody regimes. Presently, as a default rule,[5] when parties are awarded joint custody, the court must designate a "domiciliary parent," who thereby has the authority to make all decisions affecting the child. La. R.S. 9:335(B)(3). All major decisions made by the domiciliary parent concerning the child are subject to judicial review upon motion by the non-domiciliary parent.[6] Non-major decisions are not subject to judicial review.[7] The domiciliary parent is also the parent with whom the child primarily resides, but the other parent shall have physical custody during time periods that ensure that the child has frequent and continuing contact with both parents. La. R.S. 9:335(B)(2).

The right of visitation is distinct from legal custody; it may include physical custody but never legal custody. *Legal* custody and visitation are mutually exclusive in that one party cannot have both regarding the same child. *Cedotal v. Cedotal*, 05-1524 (La. App. 1 Cir. 11/4/05), 927 So. 2d 433, 436, *citing DeSoto v. DeSoto,* 04-1248 (La. App. 3 Cir. 2/2/05), 893 So.2d 175, 177. The phrase "primary custody" is sometimes used by

---

[5] The joint custody implementation order may decline to make this designation by affirmatively providing that there shall be no such designation, "or for other good cause shown." La. R.S. 9:335(B)(1). In such instances, Title VII of Book I of the Civil Code governs the rights and responsibilities of the parents. La. R.S. 9:335(C).

[6] The law presumes that all major decisions made by the domiciliary parent are in the best interest of the child. The nondomiciliary parent has the burden of proving the decision is not in the best interest of the child. La. R.S. 9:335(B)(3).

[7] Regardless, however, the law obligates the parents in a joint custody regime "to exchange information concerning the health, education, and welfare of the child and to confer with one another in exercising decision-making authority." La. R.S. 9:336.

Louisiana courts[8] but does not exist in Louisiana legislation and has no specific meaning.

**Fiduciary role of court.** In a child custody matter, the trial court is not merely a referee or umpire, but instead:

> The trial judge sits as a sort of fiduciary on behalf of the child, and *must pursue actively that course of conduct which will be of the greatest benefit to the child.* It is the child's emotional, physical, material and social well-being and health which are the judge's very purpose in child custody cases. *He must protect the child from the harsh realities of the parents' often bitter, vengeful, and typically highly emotional conflict.* (Emphasis added.)

*Turner v. Turner*, 455 So. 2d 1374, 1379 (La. 1984).

**Best interest of the child; parental rights; determination of custody regime.** The best interest of the child is the paramount principle in child custody determinations. La. C.C. art. 131. Within that limitation, La. C.C. 132 allows parents to stipulate custody:

> If the parents agree who is to have custody, the court shall award custody in accordance with their agreement unless the provisions of R.S. 9:364 apply or the best interest of the child requires a different award. Subject to the provisions of R.S. 9:364, in the absence of agreement, or if the agreement is not in the best interest of the child, the court shall award custody to the parents jointly; however, if custody in one parent is shown by clear and convincing evidence to serve the best interest of the child, the court shall award custody to that parent.

Regardless, a binding agreement cannot exist in the absence of an object determined at least as to its kind. La. C.C. art. 1973.

La. C.C. art. 134(A) enumerates fourteen factors which the court generally must consider in determining the best interest of the child for purposes of custody.

---

[8] *E.g.*, *Bergeron v. Bergeron*, 492 So. 2d 1193, 1194 (La. 1986).

8

However, in custody disputes between a parent and a nonparent, the best interest of the child must be "cautiously weighed" against parental rights:

> The best interests of the child must be cautiously weighed against the rights of the biological parent, which it is also necessary for the court to consider. While it certainly could be in the interest of many children to be reared in homes other than that of their parents, that test standing alone cannot be used to deprive the parents of custody of their child.

*Lewis v. Taylor,* 554 So. 2d 158, 161 (La. App. 2 Cir. 1989), *writ denied,* 554 So. 2d 1237 (1990). As early as 1923, the United States Supreme Court held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own." *Meyer v. Nebraska*, 262 U.S. 390, 401, 43 S. Ct. 625, 627 (1923). More recently, the court held that biological parents have a fundamental constitutional right to parent their children—to make decisions regarding care, custody, and control—without interference by third parties. *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 2060 (2000).

That parental right, however, does not justify parental custody in all circumstances. "If an award of joint custody or of sole custody to either parent *would result in substantial harm to the child*, the court shall award custody to another person with whom the child has been living in a wholesome and stable environment, or otherwise to any other person able to provide an adequate and stable environment." La. C.C. art. 133. Comment (b) to this article explains that Louisiana's longstanding recognition of the primacy of *parental* custodial rights over all other claims of custodial rights is made manifest in assigning this burden of proof to the nonparent:

The requirement of proof that parental custody would result in "substantial harm" to the child that is stated in this Article…has been adopted because it represents an efficient means of giving effect to a parent's paramount right to custody of his child as against any nonparent. The primacy of that parental right was recognized by the Louisiana jurisprudence long before it was given effect by the legislature…[I]t is clear that the heart of the parental primacy concept, the rule that a nonparent always bears the burden of proof in a custody contest with a parent…has not been affected by this revision.

The courts have narrowly construed "substantial harm" as used in La. C.C. art. 133 and have established that the burden must be satisfied by clear and convincing evidence. *Creed v. Creed*, 94-268 (La. App. 3 Cir. 12/21/94), 647 So. 2d 1362. Therein, the court reversed a judgment granting custody to paternal grandparents and awarded sole custody to the ex-wife/mother, stating:

[W]e find no compelling reasons to deprive the natural parent of custody. The record establishes, at most, that due to Denise Creed's present economic status [due in part to the ex-husband/father's almost complete nonpayment of child support] she has not lived for long periods of time in one place and is often relegated to staying with family and friends of whom some are living in open concubinage. There is some conflicting evidence at trial that indicated that she dates or has dated a married man, but nothing in the record indicates that she lived with that man or that her relationship with him posed a threat to the children. Finally, evidence at trial established that she left the children for numerous weekends with the children's paternal grandparents, and apparently, on one occasion, brought the children to the paternal grandparents' home allegedly unbathed and disheveled. Equally clear, however, from the record is that the children, under the care of Denise Creed, were well nourished, loved, never physically abused, and were generally well cared for despite her having no financial support from the children's father. While the paternal grandparents to whom custody was granted are married and not just living together, have good jobs, apparently own their own home, and may be better able financially to care for the children, those factors standing alone cannot be used to deprive a natural parent of custody of her child. Her unfortunate economic status

10

and arguably marginal lifestyle are not reasons enough to deny her custody of her children.

*Id.* at 1365-66. Additionally, the appellate court agreed with trial court that granting custody to the physically abusive father *would* result in substantial harm. Accordingly, the mother was granted sole custody.

In *Miller v. Miller*, 04-1355 (La. App. 3 Cir. 2/2/05), 893 So. 2d 233, the court affirmed a custody award to the paternal grandparents where: (1) the ex-wife/mother and ex-husband/father fought physically and verbally in the home over matters including internet pornography; and (2) the mother admitted she began an adulterous affair a few months after the marriage; she got pregnant at least once—possibly twice—via adultery. While the father was at work, the mother took the child and absconded back to her grandparents' home in Oklahoma. Thereafter, the father—who had a seizure disorder—paid a total of $40 in child support and once bought some diapers for the child. When the child returned to Louisiana to visit the paternal grandparents' home (where the father resided post-separation), they found fleas in his hair. The trial court granted custody to the paternal grandparents even though they were not parties to the suit, and the appellate court affirmed. *Id.* In so ruling, the appellate court explained:

> The record before us reflects great immaturity on the part of both Jennifer and Michael. Their moral choices, violent tempers, and disregard for their responsibilities as parents, as well as Michael's seizure disorder, caused the trial court to find them both unfit to raise their child…We find the trial court's decision to be well supported by both the evidence in the record and legal authority. Article 133 of the Civil Code clearly authorizes a court to award custody to a non-parent in order to prevent "substantial harm to the child."

A grandparent unable to carry the burden of proof established by La. C.C. art. 133 may, nonetheless, be granted *visitation* rights upon proving the

11

parents are not married or cohabitating and the visitation is in the best interest of the child. La. C.C. art. 136(B)(1). However, in determining the best interest of the child thereunder, the court shall consider *only* the following factors:

> (1) *A parent's fundamental constitutional right to make decisions concerning the care, custody, and control of their own children and the traditional presumption that a fit parent will act in the best interest of their children.*
> (2) The length and quality of the prior relationship between the child and the relative.
> (3) Whether the child is in need of guidance, enlightenment, or tutelage which can best be provided by the relative.
> (4) The preference of the child if he is determined to be of sufficient maturity to express a preference.
> (5) The mental and physical health of the child and the relative. (Emphasis added.)

La. C.C. art. 136(D). If the parents of a child are married and have not filed for divorce or they are living in concubinage, the provisions of La. R.S. 9:344 apply regarding visitation rights of siblings and grandparents. La. C.C. art. 136(E).

La. R.S. 9:344 further provides for grandparent visitation rights:

> A. If one of the parties to a marriage dies…and there is a minor child or children of such marriage, the parents of the deceased… without custody of such minor child…may have reasonable visitation rights to the child…of the marriage during their minority, if the court in its discretion finds that such visitation rights would be in the best interest of the child or children.
> B. When the parents of a minor child or children live in concubinage and one of the parents dies…the parents of the deceased or incarcerated party may have reasonable visitation rights to the child or children during their minority, if the court in its discretion finds that such visitation rights would be in the best interest of the child
> …
> D. If the parents of a minor child of the marriage have lived apart for a period of six months, in extraordinary circumstances, the grandparents or siblings of the child may have reasonable visitation rights to the child during

12

his minority, if the court in its discretion finds that such visitation rights would be in the best interest of the child. In determining the best interest of the child the court shall consider the same factors contained in Civil Code Article 136(D). Extraordinary circumstances shall include a determination by a court that a parent is abusing a controlled dangerous substance.

*Modification of custody*. The modification of a previous *consent* decree that established joint custody between a biological parent and a nonparent is governed by La. C.C. art. 131, not La. C.C. art. 133. *Tracie F. v. Francisco D.*, 15-1812 (La. 3/15/16), 188 So. 3d 231, 245.[9] Such modification may be granted only if the petitioner shows: (1) there has been a material change in circumstances affecting the welfare of the child since the previous decree was entered; and (2) that the proposed modification is in the best interest of the child. *Id.*; *Evans v. Lungrin, supra*.

A party seeking modification of a considered decree bears a higher burden of proof. "A *considered decree* is an award of permanent custody in which the trial court receives evidence of parental fitness to exercise care, custody, and control of children." *Id.*

> When a trial court has made a *considered decree* of permanent custody, the party seeking a change bears a heavy burden of proving that the continuation of the present custody is "so deleterious to the child as to justify a modification of the custody decree," or of proving by "clear and convincing evidence that the harm likely to be caused by the change of environment is substantially outweighed by its advantages to the child.

*Id.*, *quoting Bergeron v. Bergeron, supra.*

Appellate courts, generally, review a trial court's child custody judgment for abuse of discretion. *Gray v. Gray*, 11-548 (La. 7/1/11), 65 So.

---

[9] Notably, *Tracy F.*, *supra*, involved a parent trying to modify joint custody which he had previously stipulated with nonparents; whereas here, it is the nonparent seeking modification.

13

3d 1247. Also, findings of fact underlying a judgment concerning a proposed modification of custody are subject to manifest error review. *McLaren v. Childress*, 53,521 (La. App. 2 Cir. 7/22/20), 300 So. 3d 906. However, there is an exception to this general rule:

> However, where one or more trial court legal errors interdict the fact-finding process, the manifest error/abuse of discretion standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record and determine the sufficiency of the evidence. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. When a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, *the appellate court is required, if it can, to render judgment on the record by applying the correct law* and determining the essential material facts *de novo*. (Internal citations omitted; emphasis added.)

*Cook v. Sullivan*, 20-01471 (La. 9/30/21), 330 So. 3d 152, 157.

## ANALYSIS

Regardless of whether the decree the grandmother seeks to modify is a consent decree or a considered decree, the trial court's judgment denying her proposed modification was correct. Whether the court is considering granting joint custody or visitation to a nonparent, the parent's fundamental constitutional right to parent the child is paramount. The trial court aptly stated as much. La. C.C. art. 133 requires that "substantial harm would result to the child" before a nonparent may be granted custody.

The grandmother's three petitions for sole custody are significant evidence that she loves the child, but they are, nonetheless, unrealistic considering the total lack of evidence of substantial harm—such as child abuse, neglect, or endangerment, or parental incapacity. All of her pleadings

14

in the record include at least a reference to the father's alleged rap sheet — which ends shortly before the child was born — and the last incident being an indictment for simple battery of the mother, which was never prosecuted. The trial court appropriately commended the father for the dramatically positive turnaround of his life from that point onward.[10] We echo that commendation and implore the grandmother to recognize that turnaround and stop attempting to drag the father's name through the proverbial mud. We also implore her to refrain from petitioning the court for sole custody absent evidence showing categorically more than what is discussed herein, as such litigation is futile, financially wasteful, and understandably causes resentment in both parties.

Nevertheless, we find that the trial court erred by approving the original consent decree and by reaffirming it in 2022, despite its improper terminology, i.e., designating the father as having "primary custody" and the grandmother as having "custody/visitation."

The consent decree's use of this improper terminology renders it undeterminable which of the two possible regimes the parties have: (1) the father and grandmother have joint legal custody with the father granted domiciliary status; or (2) the father has sole legal custody while the grandmother has unsupervised visitation. On its face, the consent decree does not determine which legal custody regime was thereby established; no agreement on this point is reflected therein. The trial court's subsequent refusals to modify that non-regime perpetuated the improper terminology

---

[10] During oral argument in this court, the grandmother's attorney alleged that the father was arrested in 2023, but no evidence to that effect was introduced in the trial court. Therefore, for purposes of this appeal, the alleged arrest did not happen. We further note that this alleged arrest is not even mentioned in the litany of arrests and prosecutions alleged in the grandmother's brief to this court.

and, thus, did not determine which of the two possible regimes is in force. Therefore, from the initial petition onward, it has remained undetermined which regime of *legal custody* exists. As a result, determination of which regime is to be in force is not subject to the standards for modification of a consent decree or a considered decree.

Pursuant to *Cook*, *supra*, we determine *de novo* that the father has sole legal custody and the grandmother has the right of unsupervised visitation. The record demonstrates that the grandmother cannot carry her burden of proof under La. C.C. art. 133.

## CONCLUSION

The judgment of the trial court is **AFFIRMED** in its denial of the grandmother's modification request. The schedule of physical custody established in the decree is **AFFIRMED.** "Primary custody" and "custody/visitation" are **STRICKEN** from the custody decree. The trial court judgment is **AMENDED** to provide that the father has sole legal custody and the grandmother has unsupervised visitation. **AFFIRMED IN PART; AMENDED IN PART; AND AFFIRMED AS AMENDED.**

All costs of this appeal and the costs in the trial court necessitated by the grandmother's instant petition for modification are taxed to the grandmother.